1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

7   JOHN TOLE MOXLEY,

8          *Petitioner*,                                    2:07-cv-01123-RLH-GWF

9
    vs.                                                     ORDER
10

11  DWIGHT NEVEN, *et al.*,

12          *Respondents*.

13

14          This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for

15  a final decision on the claims remaining.  Petitioner John Tole Moxley seeks to set aside his

16  2004 Nevada state conviction, pursuant to a jury verdict, of possession of a stolen vehicle and

17  his adjudication as a habitual criminal.  All grounds other than Grounds 1(A), 2 and 5 have

18  been dismissed.

19                          ***Standard of Review on the Merits***

20          The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

21  deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which

22  demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*,

23  131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court

24  may not grant habeas relief merely because it might conclude that the state court decision

25  was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant

26  relief only if the state court decision: (1) was either contrary to or involved an unreasonable

27  application of clearly established law as determined by the United States Supreme Court

28  based on the record presented to the state courts; or (2) was based on an unreasonable

1  determination of the facts in light of the evidence presented at the state court proceeding.

2  131 S.Ct. at 1398-1401.

3       A state court decision is "contrary to" law clearly established by the Supreme Court only

4  if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

5  if the decision confronts a set of facts that are materially indistinguishable from a Supreme

6  Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540

7  U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).  A state court decision is not

8  contrary to established federal law merely because it does not cite the Supreme Court's

9  opinions. *Id.*  Indeed, the Supreme Court has held that a state court need not even be aware

10 of its precedents, so long as neither the reasoning nor the result of its decision contradicts

11 them. *Id.*  Moreover, "[a] federal court may not overrule a state court for simply holding a view

12 different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."

13 540 U.S. at 16, 124 S.Ct. at 11.  For, at bottom, a decision that does not conflict with the

14 reasoning or holdings of Supreme Court precedent is not contrary to clearly established

15 federal law.

16      A state court decision constitutes an "unreasonable application" of clearly established

17 federal law only if it is demonstrated that the state court's application of Supreme Court

18 precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.,*

19 *Mitchell*, 540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir.

20 2004).

21      To the extent that the state court's factual findings are challenged, the "unreasonable

22 determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g.,*

23 *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal

24 courts "must be particularly deferential" to state court factual determinations.  *Id*.  The

25 governing standard is not satisfied by a showing merely that the state court finding was

26 "clearly erroneous."  393 F.3d at 973.  Rather, AEDPA requires substantially more deference:

27          . . . . [I]n  concluding that a state-court finding is unsupported by
            substantial evidence in the state-court record, it is not enough that
28          we would reverse in similar circumstances if this were an appeal

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

### *Discussion*

#### *Ground 1(A)*

In Ground 1(A), petitioner alleges that he was denied due process in violation of the Fifth and Fourteenth Amendments because the evidence was insufficient to establish that he knew or had reason to know that the vehicle was stolen.

The Supreme Court of Nevada rejected the claim presented on direct appeal on the following grounds, in which it summarized the trial evidence against petitioner:

> Determining the weight and credibility of testimony is a question for the jury. The jury's verdict will not be disturbed on appeal when substantial evidence supports the verdict. "The question for the reviewing court is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" "This court is not a fact-finding tribunal; that function is best performed by the district court." We also note that circumstantial evidence alone may sustain a conviction. "[A]lthough mere presence cannot support an inference that one is a party to an offense, presence together with other circumstances may do so."
>
> Our review of the record on appeal reveals sufficient evidence to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. In particular, we note that on November 12, 2002, a neighbor, Melissa Bifulco, witnessed a man driving a white compact vehicle into the backyard of 1693 Eddingham, Las Vegas, Nevada. Bifulco testified that she was familiar with appellant and recognized him. Appellant stipulated to the witness's identification in court. As Bifulco watched through her upstairs window, appellant took the license plate off the vehicle, unloaded items from the vehicle, and transferred the items inside the house. Later, items recovered from inside the house included the passport and identification of the individual

who owned the car.[FN8]  Ms. Bifulco called 911, reporting the suspicious activities and expressing concern because she had not seen the owner of the house, Steven Such, for several days.

> [FN8] On November 10, 2002, two days before appellant was arrested for the present conviction, Amir Lagstein was robbed at gunpoint in his home by a man wearing a black ski mask.  In addition to other personal items, the gunman stole Lagstein's white 1991 Mitsubishi Eclipse.  Lagstein could not identify the gunman.

> Officer Thomas Stoll responded to the call, and looking through the open gate, could see a white, compact car missing license plates.  Officer Stoll entered the backyard, checked the VIN number of the car and discovered that the car had been reported stolen.  Officer Stoll testified that it appeared that someone had left in a hurry.  The water hose was left running, music was left playing, and the sliding glass door to the house was left open.  Officer Stoll approached the sliding glass door of the house to check on the welfare of Such.  Such, was found sleeping inside and consented to a search.  During the search of the property, officers found appellant hiding behind boxes in the rafters of the garage.  Based on the above, we conclude that the jury could reasonably infer from the evidence presented that appellant knew or had reason to believe that the vehicle was stolen.

#35, Ex. 40, at 2-4 (emphasis in original)(citation footnotes omitted).

Petitioner has not disputed the state supreme court's summary of the trial evidence in its decision on direct appeal with a showing of clear and convincing evidence in the state court record to the contrary.  The state high court's summary thus is presumed to be correct.  *See,e.g., Sims v. Brown*, 425 F.3d 560, 563 n.1 (9th Cir. 2005).

The state supreme court's rejection of petitioner's challenge to the sufficiency of the evidence on the foregoing facts was neither contrary to nor an unreasonable application of clearly established federal law.

On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle."  *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *E.g., Davis*, 333 F.3d at 992.  Accordingly, the reviewing

1    court, when faced with a record of historical facts that supports conflicting inferences, must

2    presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer

3    to that resolution, even if the resolution by the state court trier of fact of specific conflicts does

4    not affirmatively appear in the record.  *Id.*  The *Jackson* standard is applied with reference to

5    the substantive elements of the criminal offense as defined by state law.  *E.g., Davis*, 333

6    F.3d at 992.  When the deferential standards of the AEDPA and *Jackson* are applied

7    together, the question for decision on federal habeas review thus becomes one of whether

8    the state supreme court's decision unreasonably applied the *Jackson* standard to the

9    evidence at trial.  *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

10          The evidence reflected that Moxley removed the license plates from the car, removed

11   personal identification papers – including the vehicle title[1] – with another person's name from

12   the vehicle, apparently left hurriedly when an officer arrived while he was cleaning the car,

13   and then was found hiding later only after other officers arrived at the scene and conducted

14   a search.  The state high court's conclusion that a jury reasonably could infer from this

15   circumstantial evidence that petitioner knew or should have known that the vehicle was stolen

16   was neither contrary to nor an unreasonable application of clearly established federal law.

17          Petitioner urges that the act of "routinely taking a license plate off the car" was

18   "completely consistent with numerous factual scenarios suggesting innocence, e.g., intending

19   to wash the car or moving the car at Such's request."[2]  Federal habeas counsel's bald

20   suggestion that people "routinely" remove license plates to wash a car or to move a car

21   strains credulity.  Such a suggestion would not establish insufficiency of the evidence even

22   on *de novo* review.  Such a suggestion certainly does not establish a basis for overturning the

23   state supreme court's decision on deferential AEDPA review.

24          The further fact that there were not other possible indicia in this particular case that the

25   vehicle was stolen – such as a damaged steering column – did not render the evidence

26   ────────────────

27         [1]See #34, Ex. 23, at II-75, II-78 & II-111 (Detective Theresa Coleman).

28         [2]#33, at 9.

1    insufficient where the evidence that was presented in the case was sufficient to infer that

2    petitioner knew or should have known that the vehicle was stolen.[3]  It is not an inexorable

3    requirement for sufficiency of the evidence that a vehicle be damaged as from a break-in for

4    a person to have actual or constructive knowledge that the vehicle is stolen.

5            Ground 1(A) therefore does not provide a basis for federal habeas relief.

6        **Ground 2**

7            In the remaining claims in Ground 2, petitioner alleges that he was denied a right to

8    due process of law under the Fifth and Fourteenth Amendments when – in a situation where

9    negotiations on the charge of possession of a stolen vehicle allegedly had become intertwined

10   with the negotiations on a murder charge that also was pending against petitioner – the State

11   allegedly breached a promise to accept a plea to voluntary manslaughter in the murder case

12   after petitioner detrimentally relied upon the promise by releasing his bail bond in the murder

13   case.  Petitioner alleges that he was prejudiced in the present case because he thereafter

14   was unable to raise the bond premium required in either case to be able to secure his release

15   on bail in order to prepare his defense in this case.[4]

16           Petitioner presented a claim corresponding to the above claims in federal Ground 2 in

17   an original mandamus petition filed in the state supreme court.  On a prior *sua sponte* show

18   cause inquiry, the Court held that the mandamus petition exhausted the claims presented

19   therein pursuant to the Ninth Circuit's decision in *Chambers v. McDaniel*, 549 F.3d 1191 (9th

20   Cir. 2008).  #42, at 5-6.

21           The Supreme Court of Nevada summarily denied relief on the mandamus petition.  The

22   court stated in pertinent part that "[w]e have considered the petition on file herein, and we are

23

24   ───────────────

25       [3]Lagstein testified that the armed gunman took the keys and drove off in the vehicle. #34, Ex. 23, at II-66.

26       [4]After the Court held that the claims were not exhausted, petitioner dismissed additional claims under
27   Ground 2 that alleged that he detrimentally relied upon a promise by the State that he could plead guilty in the
     stolen vehicle case, that alleged that he had a deal that precluded habitual criminal enhancement in the
28   stolen vehicle case, and that sought specific performance of an alleged promise or plea deal in the stolen
     vehicle case.  See ## 53, 62 & 64.

1  not satisfied that this court's intervention by way of extraordinary relief is warranted at this
2  time."[5]

3          The deferential AEDPA standard of review applies fully to a summary rejection of a
4  claim on the merits without an opinion explaining the state court's reasoning.  *Harrington v.*
5  *Richter*, 131 S.Ct. 770, 784 (2011).  When a state court's decision is unaccompanied by an
6  articulated explanation, the petitioner still must demonstrate that there was no reasonable
7  basis for the state court to deny relief.  *Id.*  The state court's determination that a claim lacks
8  merit precludes federal habeas relief under the AEDPA so long as fairminded jurists could
9  disagree on the correctness of the state court's decision.  131 S.Ct. at 786.  In this regard, it
10 is not an unreasonable application of clearly established federal law for a state court to
11 decline to apply a specific legal rule that has not been squarely established by the United
12 States Supreme Court.  *Id.*  When considering a summary state court denial of a claim, the
13 federal habeas court thus "must determine what arguments or theories . . . could have
14 supported . . . the state court's decision; and then it must ask whether it is possible fairminded
15 jurists could disagree that those arguments or theories are inconsistent with the holding in a
16 prior decision of" the United States Supreme Court.  *Id.*

17         In the present case, the state supreme court's rejection of the claims corresponding
18 to Ground 2 was neither contrary to nor an unreasonable application of clearly established
19 federal law as determined by the United States Supreme Court.

20         This conclusion holds true even if this Court were to assume, *arguendo*, that petitioner
21 could establish that the State made a firm, finalized and specific plea offer; that he accepted
22 the plea offer; and that he detrimentally relied on the offer before the State withdrew it.

23         Petitioner does not cite an apposite decision of the United States Supreme Court
24 holding that a due process violation occurs when a defendant detrimentally relies upon a plea
25 offer that he has accepted but which is withdrawn by the State before it is accepted by the
26 court.

27 _____

28         [5]#37, Ex. 76.  The Court has held, under *Chambers, supra*, that this disposition was on the merits.

1    Petitioner relies upon *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d

2   427 (1971), but *Santobello* made no such holding.  In *Santobello*, the State and the defendant

3   entered into a plea agreement that was accepted by the trial court.  The plea bargain included

4   an agreement by the State to make no recommendation as to the sentence.  The State,

5   through a different prosecutor, failed to honor this commitment at sentencing and instead

6   argued for imposition of the maximum sentence.  The Supreme Court held that the defendant

7   in this circumstance could either obtain specific performance of the plea agreement or

8   withdraw his plea, depending upon the circumstances of the case.[6]

9    *Santobello* did not address a circumstance where the State had withdrawn from a

10  negotiated plea bargain before it was accepted by the trial court.  *Santobello* instead involved

11  the enforcement of a plea agreement that had been accepted by the trial court where the

12  matter had proceeded forward to sentencing based upon that agreement.  The Supreme

13  Court reaffirmed that a defendant does not have an absolute right to have a guilty plea

14  accepted, stating that a trial court could reject a plea in the exercise of sound judicial

15  discretion.  404 U.S. at 261-62, 92 S.Ct. at 498.

16    In contrast, in *Mabry v. Johnson*, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437

17  (1984), the Court did address a prosecution withdrawal from a plea bargain that had been

18  fully agreed to by the State and the defense but that had not been accepted by the trial court.

19    In *Mabry*, the defendant clearly had accepted the State's offer.  The State then

20  withdrew the accepted offer, however, on the basis that a mistake had been made.  The State

21  proposed a different plea bargain with a recommendation for a more onerous sentence.  The

22  defendant initially rejected the new offer but later accepted the second offer at trial.  On

23  federal habeas review, the district court denied relief on the basis that the defendant had not

24  detrimentally relied on the first proposed plea agreement.  The court of appeals reversed and

25  _____

26    [6]Other than a reference to "fairness," the *Santobello* opinion does not elucidate the constitutional
   underpinning of its holding.  The Supreme Court does not exercise supervisory authority over the state courts
27  as it does over the federal courts.  The high court can direct the manner in which federal criminal proceedings
   are conducted even in the absence of constitutional error but it may not do so with regard to state criminal
28  cases.  *See, e.g., Danforth v. Minnesota*, 552 U.S. 264, 289, 128 S.Ct. 1029, 1046, 169 L.Ed.2d 859 (2008).

1  held that "'fairness' precluded the prosecution's withdrawal of a plea proposal once accepted

2  by [the defendant]."  467 U.S. at 506, 104 S.Ct. at 2545-46.

3      The Supreme Court granted *certiorari* to consider the question of "whether a

4  defendant's acceptance of a prosecutor's proposed plea bargain creates a constitutional right

5  to have the bargain specifically enforced."  467 U.S. at 505, 104 S.Ct. at 2545.

6      The Supreme Court answered this question with an unqualified "no."  Justice Stevens'

7  opinion for the Court clearly rejected the concept that the withdrawal of an accepted plea offer

8  had any constitutional significance:

9      Respondent can obtain federal habeas corpus relief only
   if his custody is in violation of the Federal Constitution.  *A plea*
10  *bargain standing alone is without constitutional significance; in*
   *itself it is a mere executory agreement which, until embodied in*
11  *the judgment of a court, does not deprive an accused of liberty or*
   *any other constitutionally protected interest.*  It is the ensuing
12  guilty plea that implicates the Constitution.  Only after respondent
   pleaded guilty was he convicted, and it is that conviction which
13  gave rise to the deprivation of respondent's liberty at issue here.

14                    . . . . .

15      Thus, because it did not impair the voluntariness or
   intelligence of his guilty plea, *respondent's inability to enforce the*
16  *prosecutor's offer is without constitutional significance.*  Neither is
   the question whether the prosecutor was negligent or otherwise
17  culpable in first making and then withdrawing his offer relevant.
   The Due Process Clause is not a code of ethics for prosecutors;
18  its concern is with the manner in which persons are deprived of
   their liberty.  Here respondent was not deprived of his liberty in
19  any fundamentally unfair way.  Respondent was fully aware of the
   likely consequences when he pleaded guilty; it is not unfair to
20  expect him to live with those consequences now.

21  467 U.S. at 507-08 & 510-11, 104 S.Ct. at 2546 & 2548 (emphasis added).

22      The Supreme Court did not hold that a defendant's inability to enforce an accepted

23  plea offer is without constitutional significance only so long as there is no detrimental reliance.

24  Such an analysis had been followed in the district court, but the Court's stated holding did not

25  turn upon the presence or absence of detrimental reliance.  The Court simply held, without

26  qualification, that a withdrawn plea agreement is "without constitutional significance."[7]

27  _____

28      [7]This Court reviewed the negative citing references noted on Westlaw as to *Mabry*, and nothing
                    (continued...)

"Clearly established federal law" under § 2254(d)(1) consists of "the holdings, as opposed to the *dicta*," of the decisions of the United States Supreme Court, as of the time of the relevant state-court decision under review.  *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).  Petitioner has not identified any apposite *holding* of the United States Supreme Court supporting his claim as of the time of the 2004 decision by the state supreme court rejecting his petition.  Even if Moxley were to seek to distinguish *Mabry* in one fashion or another, the critical point remains that the closest Supreme Court holding regarding his claim held without qualification that a withdrawn plea agreement is "without constitutional significance."

Petitioner's claim therefore does not even make it out of the starting gate under the AEDPA.  He has not identified any apposite holding of the United States Supreme Court that was contrary to the Nevada Supreme Court's decision or that was unreasonably applied by the state supreme court.  The United States Supreme Court never has held that the Due Process Clause places any limitation upon the ability of the State to withdraw from a plea agreement that has not been accepted by the trial court.  The available Supreme Court precedent instead supports a holding that a defendant has no constitutional right to enforce a plea bargain that had not yet been accepted by the trial court.[8]

_____

[7](...continued)
therein affects the relevant holding in *Mabry*.  Indeed, if anything, the later discussion of *Mabry* in *Puckett v. United States*, ___ U.S. ___, 129 S.Ct. 1423, 1430 n. 1, 173 L.Ed.2d 266 (2009), renders *Mabry* even less helpful to a defendant.

[8]Petitioner's reliance in the federal reply upon Ninth Circuit authority – particularly pre-AEDPA circuit authority – is misplaced.  Under the AEDPA, a state supreme court is bound to follow only the holdings of the United States Supreme Court, not those of a federal court of appeals.  *See,e.g., Renico v. Lett*, ___ U.S. ___, 130 S.Ct. 1855, 1866, 176 L.Ed.2d 678 (2010).

The Court additionally notes that in *McKenzie v. Risley*, 801 F.2d 1519 (9th Cir. 1986), *vacated in part on other grounds*, 842 F.2d 1525 (9th Cir. 1988)(en banc), the panel opinion held that the defendant had not reasonably relied on the State's offer.  801 F.2d at 1527-28.  Thus, while the Ninth Circuit discussed – relying on law from federal criminal cases – detrimental reliance, the decision hardly constitutes compelling authority confirming the existence of a rule clearly established by United States Supreme Court authority that is binding on the States on deferential AEDPA review.

(continued...)

1        Moreover, petitioner would not be entitled to relief on deferential AEDPA review even
2 if, *arguendo*, there were apposite United States Supreme Court precedent clearly establishing
3 a constitutional claim based upon detrimental reliance in this context.  The Nevada Supreme
4 Court's rejection of his claim would not have been an objectively unreasonable application of
5 any such – purely *arguendo* – constitutional rule requiring enforcement of a plea bargain
6 where detrimental reliance is demonstrated.

7        Under the pre-AEDPA Ninth Circuit authorities relied upon by petitioner, the
8 defendant's reliance must be reasonable, which is an objective rather than a subjective
9 inquiry.  *E.g., McKenzie v. Risley*, 801 F.2d 1519, 1528 (9th Cir. 1986), *vacated in part on*
10 *other grounds*, 842 F.2d 1525 (9th Cir. 1988)(*en banc*).

11        In the present case, Moxley did not simply gratuitously stipulate to revocation of his bail
12 in the murder case on a blank slate.  The State had filed a motion to revoke bail in the murder
13 case on the ground that Moxley had violated the conditions of his release on bail by
14 committing the charged offense in the stolen vehicle case.[9]  The State's motion came on
15 again for hearing in the murder case on Wednesday, March 12, 2003.  At the hearing, the
16 following transpired, with Moxley, who was representing himself, commencing the discussion:

17            THE DEFENDANT: Counsel has already had – we're *entering*
18                    negotiations right now, and I'd like to
                      stipulate now to the remand for this at this
19                    time and reserve the right to reissue a
                      rehearing on that at a later date *in case*
20                    *negotiations don't go the way they expect*.

21                           . . . . .

22            MS. MONROE:      Your Honor, I explained to Mr. Moxley, he's

23

24        [8](...continued)
        Similarly, in *United States v. Savage*, 978 F.2d 1136 (9th Cir. 1992), the Ninth Circuit held that the
 defendant had not demonstrated detrimental reliance.  978 F.2d at 1137.  The *Savage* panel's citation of
25 *McKenzie* – in a federal criminal case – for the proposition that a defendant's detrimental reliance could make
 a plea bargain binding hardly strengthens petitioner's hand on deferential AEDPA review.

26

27        Petitioner must show that the state court's rejection of his claim was contrary to or an unreasonable
 application of apposite holdings of the United States Supreme Court, not *dicta* in pre-AEDPA circuit authority.

28        [9]#55, Ex. 91 (with supporting documents).  See also #55, Exhs. 94-99 (continuances of the motion).

1                                      not getting any credit on this case, so he's
2                                      not in custody, so the time he's been sitting
                                     in jail it is not going to this case.

3        THE COURT:       Dead time.

4        MS. MONROE:     So I think he's agreed to go in.  Also he's
5                              correct, we are discussing *possible* negotiations, and I think our calendar call is
6                              next week.

7        THE COURT:       All right.  Fine.

       THE DEFENDANT: Tuesday.

8        THE COURT:       All right.  Fine.  Remanded to custody on
9                              this case, so he starts doing his credit.

10       THE . . . CLERK:   Do you want the bond exonerated?

11       THE DEFENDANT: Yes.  Still reserving the right to re-enter.

12       THE COURT:       Exactly.

13 #55, Ex. 100, at 3-4 (emphasis added).

14      It was not reasonable for a defendant in Moxley's position to believe that he had a firm

15 deal in place upon which he could take action in reliance.  Regardless of petitioner's dispute

16 as to what was offered when during discussions off the record, his own contemporaneous

17 assessment of the situation – at the critical juncture when he stipulated to revocation of his

18 bail – explicitly recognized the possibility that the negotiations might fall through.  Against that

19 backdrop, his stipulation to revocation of his bail while expressly acknowledging the possibility

20 that negotiations might not "go the way they expect" was not a reasonable choice by the self-

21 represented defendant.  *Cf. McKenzie*, 801 F.2d at 1528 (unreasonable for defense counsel

22 to rely on the agreement as though it were not contingent).  The right to self-representation

23 of course is not a right to effective self-representation.[10]

24      / / / /

25

26

27           [10]*Cf. United States v. Hernandez*, 203 F.3d 614, 623 n.12 (9th Cir. 2000), *abrogated in part by Indiana v. Edwards*, ___ U.S. ___, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008)(neither a defendant's lack of technical
28 legal competence nor the inability to put on an effective defense constitutes a legitimate ground for denying the right of self-representation).

Accordingly, the Nevada Supreme Court's rejection of this claim in Moxley's mandamus petition was neither contrary to nor an unreasonable application of clearly established federal law.  A determination that Moxley's reliance was not reasonable would not have been an objectively unreasonable application of a detrimental-reliance rule even if, *arguendo*, such a rule had been clearly established by (as yet uncited) United States Supreme Court authority.   Again, on deferential AEDPA review, this Court's task is to "determine what arguments or theories . . . could have supported . . . the state court's decision . . . and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the United States Supreme Court.   The state supreme court's rejection of petitioner's claim readily passes muster under this standard.

Ground 2 therefore does not provide a basis for federal habeas relief.[11]

_____

[11]It further is subject to question whether petitioner in truth was substantially prejudiced with respect to the action taken as to his bail in the murder case.  It is far from a foregone conclusion that Moxley would have been able to defeat the State's motion to revoke if he had continued to contest the motion.  Moxley's opposition to the motion was based upon the alleged insufficiency of the evidence in the stolen vehicle case and upon the difficulty of preparing a defense while in custody. #55, Ex. 92.  However, as discussed above under Ground 1(A), there was sufficient evidence to support the stolen vehicle charge.  If bail were subject to revocation on the basis that petitioner committed an offense while out on bail, it is unlikely that the trial court would have denied  revocation based solely on an alleged increased difficulty in preparing a defense.  Any such result would follow from petitioner's own actions in violating the terms of his release.  Further, prior to the March 12, 2003, motion hearing, Moxley had remained in pretrial detention on an approximately $3,000 bail requirement on the stolen vehicle charge.  (He maintains that he did not seek release on bail on the stolen vehicle charge while the motion to revoke was pending in the murder case.)

Petitioner asserts that his mother put up $50,000 in her retirement monies for the bond premium on the bail in the murder case.  Yet it was his own actions that led to the loss of any further benefit from that bond premium.  First, he committed an offense for which he since has been convicted, such that his bail became subject to potential revocation in the first instance.  Second, he pursued a course of action that led to the exoneration of the bail bond prior to the time that a written plea agreement had been finalized and then presented to and accepted by the court.  Petitioner assented to revocation of bail and exoneration of the bond in an effort to start accruing credit for time served on the murder charge.  (Such a stratagem could succeed only if he were acquitted on the stolen vehicle charge.)  If avoiding forfeiture of the bond premium was of more substantial concern to Moxley than trying to possibly accrue some credit for time served, Moxley could have fought the motion to revoke rather than stipulating to revocation of bail and exoneration of the bond.  Or, at the very least, he could have sought to postpone the motion hearing once again pending consummation of the plea bargain and acceptance by the court, possibly within only six days' time.  Moxley instead made a tactical decision to stipulate to revocation in order to start accruing as much credit for time served as possible prior to the plea agreement being finalized and accepted by the court.  It was his decision in the final analysis

(continued...)

-13-

### Ground 5

In Ground 5,[12] petitioner alleges that he was denied effective assistance of counsel when appellate counsel failed to challenge the denial of his motion to suppress the evidence obtained from the back yard of the residence prior to the point in time when the owner of the home consented to a search.

The basic background facts are summarized under Ground 1(A).  The key facts that are directly pertinent to the underlying Fourth Amendment issue are as follows.

On November 12, 2002, Melissa Bifulco called the 911 emergency dispatcher.[13]

---

[11](...continued)
to go ahead and exonerate the bond in an effort to gain six days credit for time served in advance of a plea agreement being finalized and accepted by the trial court.  The right to self-representation, again, is not a right to effective self-representation.  A self-represented defendant remains responsible for protecting his own interests in what continues thereafter to be an adversarial proceeding.  That is why state and federal courts during a *Faretta* canvass strongly encourage criminal defendants to consider the risks of undertaking self-representation.

[12]All grounds other than Grounds 1(A), 2 and 5 have been dismissed.

[13]Federal habeas counsel suggests that Bifulco's call "was identified throughout the case as a 911 call when it was in reality a 411 non-emergency call to Metro Dispatch, not the 911 emergency operator." #33, at 16.  Counsel has not demonstrated that this assertion is supported by competent evidence admitted into evidence in the state courts.

Melissa Bifulco testified – both at the preliminary hearing and at trial – that she called 911.  At the preliminary hearing, she responded affirmatively that the 911 operator had asked her at the outset of the call: "What is your emergency?"  #34, Ex. 2, at 15-16 (preliminary hearing); *id.*, Ex. 23, at II-5 & II-8 (trial).  There was no contrary testimony or evidence offered either at the preliminary hearing or at trial that Bifulco instead called a non-emergency number.  Federal habeas counsel relies upon "the transcript" of the call.  "The transcript" was not authenticated and admitted into evidence at any court proceeding.  "The transcript" is contained within an internal memorandum prepared by the county public defender's office with the subject heading: "911 Tape – 1693 Eddingham Ct." #37, Ex. 89.  The memorandum contains no certification that the transcript either is complete or accurate.  Even if the memorandum did contain such a certification by a staffer with the public defender, the memorandum – standing alone – would not be admissible in any court proceeding without foundation testimony by a witness with personal knowledge of the underlying original recording attesting that the memorandum contained a true and complete recital of the content of the original recording.  As noted, there was no such testimony in the state court record.  While the 911 recording was played for the jury, no transcript of the recording was admitted into evidence; and the trial transcript reflects only that the recording was played for the jury. #34, Ex. 23, at II-9 to II-10.  Petitioner attached the internal memorandum with his state post-conviction petition. #36, Ex. 50, petition attachments at 109-11. However, the memorandum, standing alone, is not competent evidence either as to the true and complete content of Bifulco's call or as to where it was directed.

(continued...)

-14-

1    Bifulco's 911 call -- and the corresponding dispatch to patrol officers -- reflected, in

2  principal part:  (a) that she had not seen the owner of the neighboring home for several days,

3  was concerned for his safety because he had stated that he was not hanging with the right

4  crowd, and was requesting a welfare check of the owner; (b) that two men were over at the

5  residence; (c) that one of the men was carrying a gun in his waistband; (d) that she was afraid

6  to get closer to provide a more complete description; and (e) that she saw one of the man

7  open up the back gate that morning, drive a car into the backyard, and remove plates and/or

8  parts from the vehicle, which she thought might be stolen.  The dispatch also reflected that

9  the residence in question had been associated with narcotics transactions.[14]

10    Officer Thomas Stoll of the Las Vegas Metropolitan Police Department ("Metro")

11  testified as follows.

12    Officer Stoll was the first officer to arrive following the dispatch.  He arrived on the

13  south side of the property.  As he waited for other officers to arrive, he walked around to the

14  north side of the property where the dispatch had stated that two men were present.  He

15  approached in what he described as a tactical position, likely with his gun drawn.  Stoll

16  testified that he was "just checking to see if anybody was back there," as he was on the

17  lookout for the suspicious persons reported to be stripping a car, one of whom was reported

18  to be armed.  When asked why he did not go first to the front door in performing the welfare

19  check, he testified that an officer normally would not enter a residence without backup.  He

20

21    _____

      [13](...continued)

22      The Supreme Court of Nevada found in its recital of the evidence that Bifulco called 911.  #35, Ex.
      40, at 3.  This factual finding is presumed to be correct unless shown to be incorrect by clear and convincing

23    evidence.  *See,e.g., Sims v. Brown, supra.*  Federal habeas review under the AEDPA generally is restricted to
      the evidence in the state court record.  *See,e.g., Cullen v. Pinholster, supra.*  An internal memorandum by a

24    county public defender that was never authenticated and admitted into evidence on an appropriate foundation
      is not competent evidence of anything.  It clearly is not clear and convincing evidence.

25
         The underlying Fourth Amendment issue thus is considered based on the premise that Bifulco called

26    the 911 emergency operator at the very least initially rather than a 411 non-emergency dispatch.

27      [14]#34, Ex. 2, at 5-22 (Bifulco preliminary hearing testimony); *id.*, at 23, 29-31 & 34 (Officer Thomas
      Stoll); #34, Ex. 23, at II-11 to II-19 (Bifulco trial testimony); *id.*, Ex. 22, at I-75 to I-76, I-78, I-84, I-86 to I-89, 7

28    I-91 to I-95 (Officer Stoll).

                                              -15-

testified further, *inter alia*, that "we didn't see the necessity to be knocking on the [front] door when we needed to go around and take a tactical approach" vis-à-vis the two subjects reported to be in the backyard.[15]

On the north side of the property, a double gate going into the backyard was open, and Officer Stoll saw a white vehicle sitting in the backyard with no plates.  He entered the backyard through the open gate.  He was able to see the vehicle identification number (VIN) "up on the left front portion of the dashboard," such that it would be visible through the windshield from outside the vehicle.  Officer Stoll called in the VIN number while he waited for other officers to arrive.  The dispatcher reported back approximately a minute later that the vehicle was stolen.[16]

---

[15]#34, Ex. 2, at 31-32, 34 & 47-48 (preliminary hearing); *id.*, Ex. 22, at I-76, I-78, I-87 to I-89 & I-95 (trial).  Stoll also stated at one point that "I was by myself at the beginning so I had nothing better to do than check the vehicle," given that he had to wait for backup before entering the house.  *Id.*, Ex. 22, at I-89.

[16]#34, Ex. 2, at 23-25 & 32-36 (preliminary hearing); *id.*, Ex. 22, at I-76 to I-79, I-85, I-104 & I-110 to I-111 (trial).

Petitioner posits that Officer Stoll opened the gate to enter the backyard.  At the preliminary hearing, Stoll first testified that the gate was open but then testified, in response to leading questions, that the gate was closed. #34, Ex. 2, at 32, lines 2, 10 & 11; *id.*, at 33, lines 5-7.  Officer Stoll testified at trial, however, that the preliminary hearing testimony that the gate was closed had been given without referring to his report and was incorrect.  His contemporaneous written report stated that the gate was open, as he initially had testified at the preliminary hearing.  He testified unequivocally at trial that the gate was open. #34, Ex. 22, at I-76 & I-110 to I-111.  The Supreme Court of Nevada stated in its factual recital that the gate was open.  This factual finding is presumed to be correct unless shown to be incorrect by clear and convincing evidence.  *See, e.g., Sims v. Brown, supra.*  Preliminary hearing testimony that was inconsistent with the officer's initial report and that the officer unequivocally testified at trial was incorrect does not constitute clear and convincing evidence.

Federal habeas counsel further asserts – without any citation to supporting evidence in the state court record – that Officer Stoll "opened the automobile's door [and] obtained its 'vehicle identification number' (VIN)." #33, at 20.  There is no testimony in the record that Officer Stoll opened the vehicle door to obtain the VIN.  He instead testified that he obtained the VIN for the 1991 Mitsubishi from "the left front portion of the dashboard."  Federal law has required that all passenger vehicles manufactured after 1969 place the VIN at that location precisely for the purpose that the VIN then will be "ordinarily in plain view from outside the passenger compartment" through the windshield.  *See New York v. Class*, 475 U.S. 106, 111-12, 106 S.Ct. 960, 964-65, 89 L.Ed.2d 81 (1986).  The fact that an investigating detective – after consent to search was obtained – later may have photographed the VIN as also reflected on the vehicle door frame does not in any sense reflect that *Officer Stoll* – contrary to his express testimony on the point – obtained the VIN by opening the door.  Federal habeas counsel, who has a duty of candor to this tribunal, needs to: (a) insure that his factual representations to this Court are supported by evidence in the state court record; and (b) provide, without fail, specific record citation to that supporting evidence.

-16-

1    At about this time, other officers arrived.  Officer Stoll observed that a "boom box" on

2 the patio was playing and a water hose was running.  He turned off the hose and observed

3 that the glass back door to the residence was standing wide open.  Having determined that

4 there were no subjects in the backyard, and with backup officers now on the scene, Stoll and

5 the other officers proceeded on with a check as to the welfare of the resident.  After receiving

6 no response after announcing their presence a number of times, the officers entered the

7 residence.  They eventually found Steven Such sleeping in the bedroom.  After Such was

8 awakened, he consented to a search of the premises.[17]

9    On state post-conviction review, the Supreme Court of Nevada rejected the

10 corresponding claim of ineffective assistance of appellate counsel presented to that court on

11 the following grounds:

12

13    . . . [A]ppellant claimed that appellate counsel was
     ineffective for failing to challenge the district court's rulings
     denying his pretrial and post-trial motions.  However, appellant

14    failed to present a cogent argument in support of this claim.
     Further, appellant failed to show that the omitted claims would

15    have had a reasonable likelihood of success on appeal.  The
     district court did not err in denying appellant's pretrial motion to

16    suppress because the search was lawful.  Specifically, the police
     officer initially entered the premises on a welfare check, and the

17    owner of the residence consented to a further search.[FN18]

18    [FN18] Koza v. State, 100 Nev. 245, 252, 681 P.2d
     44, 48 (1984)(recognizing that the police may enter

19    private premises without an arrest or search

20 _____

21    [17]#34, Ex. 2, at 25-26, 36-39, 46 & 53 (preliminary hearing); id., Ex. 22, at I-79 to I-80, I-83, I-97 & I-
     114 (trial).

22
     The paragraph in the text is presented in the main for background and completeness.  Petitioner's

23 Fourth Amendment claim underlying his ineffective assistance claim challenges whether what Officer Stoll
     observed in the backyard prior to entering the residence could be admitted into evidence consistent with

24 Fourth Amendment case law.

25    On a collateral but not wholly immaterial point, federal habeas counsel asserts – again without
     citation to supporting evidence in the state court record – that Officer Stoll "then called for backup officers"

26 after the dispatcher reported back that the vehicle was stolen. #33, at 20, line 4.  Stoll clearly testified that he
     was checking the back yard for, inter alia, the two subjects while he was waiting for his backup to arrive prior

27 to then completing the welfare check with the assistance of backup officers within the residence.  Counsel
     needs to state the facts to this Court as they are reflected in the state court record, without alteration or

28 unsupported embellishment.

-17-

1                 warrant to preserve life or property pursuant to the

2                 emergency doctrine); <u>State v. Taylor</u>, 114 Nev. 1071, 968 P.2d 315, 321 (1998).

3  #36, Ex. 58, at 6-7.

4        The state supreme court's rejection of this claim in its August 2, 2007, decision was

5  neither contrary to nor an unreasonable application of clearly established federal law as

6  determined by United States Supreme Court precedent.[18]

7        On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-

8  pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

9  (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard

10  of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the

11  performance prong, the issue is not what counsel might have done differently but rather is

12

13         [18]The Court has assumed *arguendo* herein that Moxley would have had standing to raise a Fourth

14  Amendment challenge to an entry and search in the backyard of the residence. He maintained that he was living at the residence with Such's permission. The State and the defense presented conflicting evidence at trial as to whether Moxley lived at the residence at the relevant time. Each side had potential arguments to

15  seek to challenge the credibility of the other side's witness testimony on this point.

16         Such, the owner of the residence, testified that Moxley was not living there. However, Such clearly

17  feared that any statement by him that Moxley was living at the residence would get him into trouble with his probation officer. #34, Ex. 23, at II-35 to II-36, II-40 to II-41 & II-45. Moxley indeed may not have lived with

18  Such at the relevant time, but Such clearly feared anyone reaching a conclusion that he did so.

19         Moxley called Janice Plemmons, who then was incarcerated on a felony conviction for identity theft

20  and also had another felony conviction for forgery. Plemmons initially testified – apparently contrary to Moxley's expectation – that Moxley was *not* living at Such's residence in November 2002 and that he did *not* have the ability to go to and from Such's house. She later testified in response to leading questioning that

21  Such had told her – in a later conversation after the fact – that Moxley was staying at his house on November 12, 2002. #34, Ex. 23, at II-143 to II-153. Plemmons' testimony was, to say the least, vague, contradictory

22  and equivocal as to whether Moxley lived at the residence on the relevant date. Moreover, obviously, the witness had been convicted of two felonies that spoke directly to her character for dishonesty.

23

24         Moxley also called his mother, Betty Moxley, and she testified that he lived at the Such residence at the relevant time. #34, Ex. 23, at II-153 to II-165. The potential for bias from a mother's love for "an erring

25  but precious son" of course is well known. *Cf.* Linda Rondstadt with Emmylou Harris, *The Sweetest Gift,* on Prisoner in Disguise (Asylum Records, 1975)(written by J.B. Coats, 1942).

26         On the conflicting testimony presented, a holding that petitioner did not have standing based upon a

27  factual finding that he did not live at the residence would not have been based upon an unreasonable determination of fact. The state courts did not make such a finding, however, one way or the other, and

28  instead relied upon the emergency doctrine exception to the warrant requirement. This Court thus has assumed, *arguendo,* that Moxley would have had standing to raise the Fourth Amendment issue.

1  whether counsel's decisions were reasonable from his perspective at the time.  The court

2  starts from a strong presumption that counsel's conduct fell within the wide range of

3  reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable

4  probability that, but for counsel's unprofessional errors, the result of the proceeding would

5  have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

6          When evaluating claims of ineffective assistance of appellate counsel, the performance

7  and prejudice prongs of the *Strickland* standard substantially overlap.  *E.g., Bailey v.*

8  *Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th

9  Cir. 1989).  On the one hand, the failure to present a weak argument on direct appeal neither

10  falls below an objective standard of competence nor causes prejudice to a petitioner for the

11  same reason – because the omitted issue had little or no likelihood of success.  *Id.*  On the

12  other, the failure to present a strong issue on appeal can both constitute deficient

13  performance and cause prejudice also for the same reason – because appellate counsel

14  failed to pursue an issue that had a reasonable probability of changing the outcome of the

15  proceeding.  Accordingly, the reviewing court must look to the merits of the omitted issue to

16  properly address a claim of ineffective assistance of appellate counsel.  *E.g., Moormann v.*

17  *Ryan*, 628 F.3d 1102, 1106-07 (9th Cir. 2010).

18          While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review

19  is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court

20  must take a "highly deferential" look at counsel's performance through the also "highly

21  deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

22          The state supreme court's rejection of petitioner's claim of ineffective assistance of

23  appellate counsel passes muster under this doubly deferential standard of review.

24          The state supreme court's conclusion that the search was lawful under the emergency

25  doctrine was not an objectively unreasonable application of Supreme Court precedent.

26          Under the legal principles identified variously as the "emergency doctrine," the

27  "emergency aid exception," or the "emergency exception," law enforcement officers may enter

28  a property without a warrant to render emergency assistance to an injured occupant or to

1   protect an occupant from imminent injury. *Michigan v. Fisher*, ___ U.S. ___, 130 S.Ct. 546,

2   548, 175 L.Ed.2d 410 (2009).  This emergency aid exception does not depend on the officers'

3   subjective intent or the seriousness of any crime that officers may be investigating when the

4   emergency arises.  *Id.*  The test applied instead is an entirely objective one of whether there

5   was an objectively reasonable basis for believing that there was an occupant in need of

6   immediate aid or protection.  *Id.*  Significantly, "[o]fficers do not need ironclad proof of 'a likely

7   serious life-threatening injury to invoke the emergency aid exception."  130 S.Ct. at 549.  The

8   entirely objective inquiry into whether there was an objectively reasonable basis for believing

9   that assistance was needed is not subject to a hindsight determination that there in fact was

10   no emergency.  *Id.*

11       In *Brigham City, Utah v. Stuart*, 547 U.S. 1125, 126 S.Ct. 1943, 164 L.Ed.2d 650, the

12   Supreme Court explained the doctrine as follows:

13           One exigency obviating the requirement of a warrant is the
    need to assist persons who are seriously injured or threatened
14   with such injury.  "'The need to protect or preserve life or avoid
    serious injury is justification for what would be otherwise illegal
15   absent an exigency or emergency.'" [*Mincey v. Arizona*, 437 U.S.
    385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).](*quoting*
16   *Wayne v. United States*, 318 F.2d 205, 212 (C.A.D.C.1963)
    (Burger, J.)); *see also* [*Michigan v. Tyler*, 436 U.S. 499, 509, 98
17   S.Ct. 1942, 56 L.Ed.2d 486 (1978)]. Accordingly, law enforcement
    officers may enter a home without a warrant to render emergency
18   assistance to an injured occupant or to protect an occupant from
    imminent injury.  *Mincey, supra*, at 392, 98 S.Ct. 2408; *see also*
19   *Georgia v. Randolph, ante*, at 118, 126 S.Ct. 1515, 1525, 164
    L.Ed.2d 208 ("[I]t would be silly to suggest that the police would
20   commit a tort by entering ... to determine whether violence (or
    threat of violence) has just occurred or is about to (or soon will)
21   occur").

22                               . . . . .

23       . . . . An action is "reasonable" under the Fourth Amendment,
    regardless of the individual officer's state of mind, "as long as the
24   circumstances, viewed *objectively*, justify [the] action."  *Scott v.
    United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168
25   (1978) (emphasis added). The officer's subjective motivation is
    irrelevant. *See Bond v. United States*, 529 U.S. 334, 338, n. 2,
26   120 S.Ct. 1462, 146 L.Ed.2d 365 (2000)("The parties properly
    agree that the subjective intent of the law enforcement officer is
27   irrelevant in determining whether that officer's actions violate the
    Fourth Amendment . . .; the issue is not his state of mind, but the
28   objective effect of his actions"); *Whren v. United States*, 517 U.S.

806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)("[O]ur prior cases make clear" that "the subjective motivations of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment").  It therefore does not matter here - even if their subjective motives could be so neatly unraveled - whether the officers entered . . . to arrest . . . and gather evidence . . . or to assist the injured and prevent further violence.

547 U.S. at 403-04, 126 S.Ct. at 1947-48 (emphasis in original).

At the time of the Nevada Supreme Court's August 2, 2007, decision, there were only a limited number of United States Supreme Court cases that had applied the emergency aid exception, thus leaving its precise contours for further development.

In the above *Brigham City* decision, officers responded to an early morning complaint of a loud party.  As they approached the house, they heard sounds of a fight within and people yelling "stop, stop" and "get off me."  Knocking on the front door appeared futile, and the noise was coming from the back of the house.  They proceeded around to the backyard where they could see a fight taking place in the kitchen.  They saw a juvenile break free from the hold of others and strike an adult in the face, drawing blood.  The Supreme Court held that these circumstances supported the officers' actions under the emergency doctrine:

In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone "unconscious" or "semi-conscious" or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.

547 U.S. at 406, 126 S.Ct. 1949.

In the earlier *Mincey* decision cited in *Brigham City*, the Supreme Court acknowledged with approval the general proposition that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  437 U.S. at 392, 98 S.Ct. at 2413.  The Court held,

-21-

however, that the emergency doctrine did not justify the search in question.  All persons in the apartment had been located before the search was conducted, and the "four-day search that included opening dresser drawers and ripping up carpets [could] hardly be rationalized in terms of the legitimate concerns that justify an emergency search."  437 U.S. at 393, 98 S.Ct. at 2414.

*Brigham City* and *Mincey* do not sharply delineate the lowermost threshold of emergency situations below which the emergency aid exception does not permit police action without a warrant.

Moreover, the Ninth Circuit has not yet determined whether the emergency aid exception applies when protection of property (such as a vehicle) rather than only a person is involved.  *See United States v. Stafford*, 416 F.3d 1068, 1078 n.2 (9th Cir. 2005); *United States v. Cervantes*, 219 F.3d 882, 889 n.7 (9th Cir. 2000),*abrogated on other grounds by Brigham City, supra*.[19]

The Ninth Circuit has definitively held, however, that officers need not have probable cause to proceed under the emergency doctrine.  They, again, need only have an objectively reasonable basis that someone (or possibly property) is in immediate need of aid and/or protection.  *See,e.g., Huff v. City of Burbank*, 632 F.3d 539, 548 (9th Cir. 2011), *petition for certiorari filed,* 80 U.S.L.W. 3098 (July 25, 2011)(No. 11-208); *Satchell v. Cardwell*, 653 F.2d 408, 412 (9th Cir. 1981).[20]

It further is established law that, once officers properly are on the property, they are permitted to perform a "protective sweep" of all or part of the property if the officers reasonably believe that there might be other persons on the premises who could pose some

---

[19]Petitioner's burden is to establish that the state supreme court's decision was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  However, when federal circuit law applying Supreme Court authority regards a question as an open one, that tends to establish that a state court ruling on the open question would be neither contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

[20]The Court, again, cites federal circuit case law as a reflection of principles applicable to this case that are neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.

1   danger to them.  *See,e.g., United States v. Flippen*, 924 F.2d 163, 165-66 (9th Cir. 1991);

2   *United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir. 1985); *United States v. Salvador*, 740

3   F.2d 752, 759 n.7 (9th Cir. 1984); *see also Mincey*, 437 U.S. at 392, 98 S.Ct. at 2413 ("when

4   the police come upon the scene of a homicide they may make a prompt warrantless search

5   of the area to see if there are other victims or if a killer is still on the premises").  As the Ninth

6   Circuit explained in the *Flippen* case, "[p]olice must be allowed to protect themselves before

7   a potential threat of danger develops into a tragedy."  924 F.2d at 166.

8        Finally, it is abundantly established law that once the police properly are on the

9   property pursuant to the emergency aid exception, they may seize any evidence that is in

10  plain view.  *E.g., Mincey*, 437 U.S. at 393, 98 S.Ct. at 2413; *Stafford*, 416 F.3d at 1076;

11  *Satchell*, 653 F.2d at 412.

12       Applying the foregoing principles to the facts of this case, the Nevada Supreme Court's

13  determination that there was not a reasonable probability that a Fourth Amendment challenge

14  would have been successful on appeal was neither contrary to nor an unreasonable

15  application of clearly established federal law.

16       It was not an objectively unreasonable application of Supreme Court precedent for the

17  state supreme court to conclude that the emergency doctrine authorized the police coming

18  on the premises.  Officers were responding to a call from a concerned neighbor reflecting that

19  she had not seen her neighbor for several days and was concerned for his safety due to the

20  company that he had been keeping; that two other men instead were over at the residence,

21  one of whom was armed; that she was afraid to get closer to get a better description; and that

22  she saw one of the men removing the plates and/or parts from a vehicle that she thought

23  might be stolen.  On deferential AEDPA review, the more general a rule is, the more leeway

24  that courts have in reaching outcomes in case-by-case determinations.  *Harrington*, 131 S.C.

25  at 786.  Particularly given the yet-to-be-determined precise contours of the emergency aid

26  exception, the Nevada Supreme Court's determination clearly was not an objectively

27  unreasonable application of clearly established federal law.  *Cf. Martin v. City of Oceanside*,

28  360 F.3d 1078 (9th Cir. 2004)(officers responded to urgent request by a father to check on the

1   welfare of his daughter as he "felt that she could be in trouble" inside a residence); *Murdock*

2   *v. Stout*, 54 F.3d 1437 (9th Cir. 1995)(*inter alia*, officers responded to a call from a passing

3   neighbor who observed what he believed to be suspicious activity at the home).[21]  Whether,

4   in hindsight, there ultimately proved to be an emergency is irrelevant.  *E.g., Michigan v.*

5   *Fisher, supra*.

6          Moreover, given the Ninth Circuit's express reservation of the substantive issue, it

7   clearly was not an objectively unreasonable application of clearly established federal law for

8   the Supreme Court of Nevada to apply the emergency doctrine not only to protection of the

9   person but to protection of property as well.  The property that was being moved and stripped,

10  the vehicle, was in the backyard, not the house.  The fact that the police – under an

11  objectively reasonable application of clearly established federal law – could seek to secure

12  and protect the property in the backyard as well entirely undercuts petitioner's premise in this

13  case that the police had no basis for going into the yard through the open gate.

14         In all events, a determination that the police properly could conduct a protective sweep

15  of the backyard in the course of a welfare check on the resident of the house would not

16  constitute an objectively unreasonable application of clearly established federal law.

17  Petitioner in essence seeks – without any supporting Supreme Court authority apposite to this

18  context – to cordon off the backyard, or curtilage, as a separate enclave requiring a separate

19  basis for the police to enter rather than instead seeking to enter through the front door of the

20  residence.  However, once the police properly were on the premises as a whole, it was not

21  objectively unreasonable for the police to perform a protective sweep first of the backyard.

22  This conclusion follows especially given that the neighbor specifically had reported the

23  presence of two suspicious men – one of which was armed – in the backyard whom she was

24  afraid to approach more closely.  It would have been foolhardy to the extreme for the police

25  to ignore the backyard and to seek to enter through the front door of the residence without

26

27  ─────────────

28       [21]The negative history citations reflected on Westlaw for the *Murdock* case do not undermine the
     point for which it is cited here.

-24-

1  seeking first to ascertain the whereabouts of the two suspicious men in the backyard.  Based
2  on the information provided to the officers, entering the residence through the front without
3  first determining the location of an armed subject in the backyard only invited tragedy.  The
4  law does not require that officers proceed in such a foolhardy manner.

5       It is established law that, once properly in the backyard pursuant to the emergency
6  doctrine and in the course of a protective sweep, the officer could seize any evidence in plain
7  view.  *E.g., Mincey, supra*.  The VIN number on the 1991 vehicle – which is the key evidence
8  that petitioner urges was obtained in violation of the Fourth Amendment – clearly was in plain
9  view under the officer's testimony on "the left front portion of the dashboard."  VIN numbers
10 have been placed at that location on all vehicles manufactured since 1969 precisely for the
11 purpose that the VIN then will be "ordinarily in plain view from outside the passenger
12 compartment" through the windshield.  *See New York v. Class*, 475 U.S. 106, 111-12, 106
13 S.Ct. 960, 964-65, 89 L.Ed.2d 81 (1986).[22]  Petitioner's argument to the contrary flies in the
14 face of a federally mandated vehicle manufacturing requirement that has been in place for
15 over four decades and established Supreme Court precedent directly on point.

16      What the particular officer said about his subjective intentions at the time clearly is
17 immaterial.  The law is unequivocally established that the inquiry is a purely objective one.
18 *E.g., Michigan v. Fisher, supra; Brigham City, supra*.

19      Petitioner urges in the federal reply that the Ninth Circuit's 2010 federal criminal
20 decision in *United States v. Struckman*, 603 F.3d 731 (9th Cir. 2009), was decided on
21 "strikingly similar" facts and demonstrates, in applying prior Supreme Court authority, that the
22 search in the present case was "equally unconstitutional."

23      Petitioner's reliance upon *Struckman* misses the mark, by a wide margin.

24      At the very outset, the *Struckman* panel expressly noted that "the government does not
25 invoke the emergency exception, but does argue that exigent circumstances justified the
26 officers' warrantless arrest and entry into Struckman's backyard."  603 F.3d at 738; *see also*

27

28      [22]See also n.16, *supra*.

-25-

*id.*, at 743 (stating a second time that "the government relies on the exigency exception, as opposed to the emergency exception").  The distinction wholly undercuts petitioner's reliance upon the case.  The Ninth Circuit has explicitly adhered to its "long-standing rule distinguishing between the emergency and exigency exceptions," which constitute "two distinct doctrines" with wholly "autonomous applications."  *Huff*, 632 F.3d at 548 & n.3.  Among other fundamental distinctions between the two doctrines, the exigency exception requires a showing of probable cause while the emergency doctrine does not.  *Id.*  Citing a federal criminal decision applying the "distinct doctrine" of the exigency exception hardly establishes that the Nevada Supreme Court's decision applying *the emergency doctrine* was an objectively unreasonable application of United States Supreme Court precedent that was not even at issue, much less applied, in the federal case.

The officers in *Struckman* were not responding to an emergency report or request for a welfare check.  The officers were responding to a report that an individual had jumped over a residential fence into a backyard at a time when the residents reportedly were not at home.  The Ninth Circuit held – in applying the exigency exception – that the officers acted properly up through the point that they looked over the fence and visually confirmed that someone fitting the description given was in the backyard.  The court held that the officers acted improperly when, instead of asking the individual who he was and what he was doing, they immediately kicked open the padlocked gate, surged into the backyard, and took the individual to the ground at gunpoint.  He proved to be a resident.  *See* 603 F.3d at 740-42.

Nothing remotely similar, much less strikingly similar, happened in the present case.  An officer responding to a welfare check call, not a mere intruder call, walked into the backyard through an open gate while engaging in a protective sweep of the backyard where two suspicious persons, one armed, had been reported.  No one was encountered in the backyard – whether a resident or otherwise – at that time to ask questions of before any further survey of the area by the officer.  Officers did not kick through a padlocked gate, swarm into the backyard, and take anyone to the ground at gunpoint.  Other than the fact that both cases involved backyards, the cases are strikingly dissimilar.

1    Even if the facts of *Struckman* had been similar to the present case and even if,

2    moreover, *Struckman* actually had addressed the issue presented in *this* case, the decision

3    would not establish a basis for relief under the AEDPA.  A 2010 federal appellate case

4    deciding an issue in a federal criminal case on *de novo* review would not have established

5    that the Nevada Supreme Court's *arguendo* contrary resolution of the same issue in 2007 was

6    either contrary to or an unreasonable application of clearly established federal law.  It is firmly

7    established law under AEDPA that "[a] federal court may not overrule a state court for simply

8    holding a view different from its own, when the precedent from [the Supreme] Court is, at

9    best, ambiguous." *Mitchell*, 540 U.S. at 16, 124 S.Ct. at 11.  Although nothing of the sort in

10   fact occurred here, merely because the Supreme Court of Nevada and the Ninth Circuit

11   *arguendo* reach a contrary resolution of a similar issue does not establish that the state

12   supreme court's decision was contrary to clearly established federal law as determined by the

13   Supreme Court.  The decisions of state courts adjudicating federal constitutional issues in

14   criminal cases are reviewed *de novo* only in the United States Supreme Court on *certiorari*

15   review following a direct appeal, not by the lower federal courts on federal habeas review.

16   Petitioner accordingly has failed to demonstrate, under the "doubly deferential"

17   standard applicable in this context, that the Nevada Supreme Court's rejection of his claim

18   of ineffective assistance of appellate counsel was either contrary to or an unreasonable

19   application of clearly established federal law.  Petitioner in particular has failed to demonstrate

20   that the state supreme court's holding that there was not a reasonable probability of success

21   on the Fourth Amendment claim on direct appeal was either contrary to or an unreasonable

22   application of clearly established federal law.

23   Ground 5 therefore does not provide a basis for federal habeas relief.

24   **Denial of Request for an Evidentiary Hearing**

25   Petitioner's request for an evidentiary hearing is denied following upon *Cullen v.*

26   *Pinholster*, 131 S.Ct. 1388 (2011).  The request is denied because the state supreme court's

27   rejection of petitioner's claims was neither contrary to nor an unreasonable application of

28   clearly established federal law on the record presented in the state courts.

1     ***Consideration of Possible Issuance of a Certificate of Appealability***

2         Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must

3 issue or deny a certificate of appealability (COA) when it enters a final order adverse to the

4 applicant.  A district court order granting or denying a certificate of appealability does not

5 eliminate the requirement that the petitioner must file a timely notice of appeal in order to

6 appeal the court's judgment.  A motion to reconsider the order regarding a certificate of

7 appealability does not extend the time to appeal.

8         As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c),

9 a petitioner must make a "substantial showing of the denial of a constitutional right" in order

10 to obtain a certificate of appealability.  *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct.

11 1595, 1603-04, 146 L.Ed.2d 542 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir.

12 1999).  To satisfy this standard, the petitioner "must demonstrate that reasonable jurists

13 would find the district court's assessment of the constitutional claim debatable or wrong."

14 *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

15         The Court denies a COA for the reasons outlined below.

16     ***Ground 1(A)***

17         Jurists of reason would not find the rejection of this ground to be debatable or wrong.

18 In Ground 1(A), petitioner alleges that he was denied due process in violation of the Fifth and

19 Fourteenth Amendments because the evidence was insufficient to establish that he knew or

20 had reason to know that the vehicle was stolen.  The evidence reflected that Moxley removed

21 the license plates from the car, removed personal identification papers – including the vehicle

22 title – with another person's name from the vehicle, apparently left hurriedly when an officer

23 arrived while he was cleaning the car, and then was found hiding later only after other officers

24 arrived at the scene and conducted a search.  The state high court's conclusion that a jury

25 reasonably could infer from this circumstantial evidence that petitioner knew or should have

26 known that the vehicle was stolen was neither contrary to nor an unreasonable application of

27 clearly established federal law.  Reasonable jurists therefore would not find debatable or

28 wrong this Court's conclusion that the state supreme court's rejection of this claim was neither

1    contrary to nor an unreasonable application of clearly established federal law.  See text,

2    *supra*, at 3-6.

3         ***Ground 2***

4         Jurists of reason would not find the rejection of this ground to be debatable or wrong.

5    In the remaining claims in Ground 2, petitioner alleges that he was denied a right to due

6    process of law under the Fifth and Fourteenth Amendments when the State allegedly

7    breached a promise to accept a plea to voluntary manslaughter in a murder case after

8    petitioner detrimentally relied upon the promise by releasing his bail bond in the murder case.

9    Petitioner alleges that he was prejudiced in the present case because he thereafter was

10   unable to raise the bond premium required in either case to be able to secure his release on

11   bail in order to prepare his defense in this case.  First, as discussed in the text, *supra*, at 6-10,

12   the most apposite Supreme Court case authority undercuts, rather than supports, petitioner's

13   position.  *See Mabry v. Johnson*, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984).

14   Second, even if, *arguendo*, a detrimental reliance claim arises under the Due Process Clause

15   in this context, petitioner explicitly acknowledged at the critical time when he stipulated to the

16   revocation of his bail that the plea negotiations might fall through.  A state supreme court

17   determination that petitioner could not obtain relief under such an *arguendo* detrimental

18   reliance rule would not have been an objectively unreasonable application of such a rule. See

19   text, *supra*, at 11-13.  Reasonable jurists therefore would not find debatable or wrong this

20   Court's conclusion that the state supreme court's rejection of this claim was neither contrary

21   to nor an unreasonable application of clearly established federal law.

22        ***Ground 5***

23        Jurists of reason would not find the rejection of this ground debatable or wrong.  In

24   Ground 5, petitioner alleges that he was denied effective assistance of counsel when

25   appellate counsel failed to challenge the denial of his motion to suppress the evidence

26   obtained from the back yard of the residence – essentially the VIN number from off the

27   dashboard of the stolen vehicle – prior to the point in time when the owner of the home

28   consented to a search.

1    At the outset, many of petitioner's factual assertions either are directly contrary to

2    factual findings made by the Supreme Court of Nevada and/or otherwise are not supported

3    by the state court record.[23]

4    On the actual factual record, it was not an objectively unreasonable application of

5    Supreme Court precedent for the state supreme court to conclude that the emergency aid

6    exception authorized the police coming on the premises.  Officers were responding to a call

7    from a concerned neighbor reflecting that she had not seen her neighbor for several days and

8    was concerned for his safety due to the company that he had been keeping; that two other

9    men instead were over at the residence, one of whom was armed; that she was afraid to get

10   closer to get a better description; and that she saw one of the men removing the plates and/or

11   parts from a vehicle that she thought might be stolen.  It was not an objectively unreasonable

12   application of Supreme Court precedent to conclude that the police properly could conduct

13   a protective sweep of the backyard in the course of a welfare check on the resident of the

14   house – particularly given the report of two subjects, one armed, in the backyard.  Moreover,

15   a determination that the police could seek to secure and protect the property in the backyard,

16   to wit, the vehicle, as well as anyone in the house, would not constitute an objectively

17   unreasonable application of clearly established federal law.  Finally, it is established law that,

18   once the officer properly was in the backyard pursuant to the emergency doctrine and in the

19   course of a protective sweep, the officer could seize any evidence in plain view.  The VIN

20   number on the dashboard clearly was in plain view, as is required by federal law for this very

21   purpose.  See text, *supra*, at 14-27.

22   A certificate of appealability therefore will be denied as to all claims.

23   IT THEREFORE IS ORDERED that the petition shall be DENIED on the merits and

24   that this action shall be DISMISSED with prejudice.

25   IT FURTHER IS ORDERED that a certificate of appealability is DENIED.  See text,

26   *supra*, at 28-30.

27

28   [23]See notes 13, 16 & 17, *supra*.

-30-

1      The Clerk of Court shall enter final judgment accordingly in favor of respondents and

2 against petitioner, dismissing this action with prejudice.

3               DATED:   September 20, 2011.

4

5

6                                     _____

7                             ROGER L. HUNT
                            United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28